IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

REGINA DRENIK,

    Plaintiff,

    v.

GORDON OHANESIAN and VERA OHANESIAN,

    Defendants.

No. Civ. 05-209 DFL DAD

MEMORANDUM OF OPINION AND ORDER

    Plaintiff Regina Drenik claims that defendants Gordon and Vera Ohanesian violated the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq*. ("FHA") and the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12900, *et seq*. ("FEHA") by "steering" her away from renting one of their second-floor apartments because she has a young child.  She seeks declaratory and injunctive relief, actual and punitive damages, and attorneys' fees and costs.  Defendants move for summary judgment. For the reasons stated below, the court: (1) denies defendants' motion for summary judgment as to plaintiff's "steering" claim; and (2) grants partial summary judgment as to any claim of

1

intentional discrimination or disparate impact.

## I.

The facts, when viewed in a light most favorable to plaintiff, are as follows.  In June 2004, Regina Drenik sought to rent an apartment from defendants Vera and Gordon Ohanesian. (Defs.' Statement of Undisputed Facts ("SUF") ¶¶ 4, 6.)  Drenik intended to live in the apartment with her then boyfriend Jason, and their 13-month-old son.  (Id.)

The Ohanesian's property has both first and second-floor apartments.  (Id. ¶ 7.)  Some of the second-floor apartments have balconies.  (Id. ¶ 8.)  The complex has a pool on the ground level.  (Id. ¶ 9.)  When Drenik came to view a second-floor apartment in the complex, Gordon Ohanesian told her that he was concerned that the balcony and the stairs leading up to the upstairs apartment posed safety hazards to her young son.  (Pl.'s Statement of Disputed Facts ("SDF") ¶ 5.)  He also advised Drenik that the pool posed a potential danger to children.  (SUF ¶ 11.) Gordon then said that he would have to consult with his wife if plaintiff was interested in the upstairs apartment.  (SDF ¶ 7.) He also said that a downstairs unit might be more suitable.  (Id. ¶ 9.)  He told plaintiff that a lower-level apartment would be available sometime in late June and that she should wait for the vacancy.  (Id. ¶ 11.)  Gordon gave Drenik an application, but, given the context of their conversation, she believed that it was for the unavailable downstairs unit.  (Id. ¶ 12.)  She never filled out the application or paid the $12 credit check fee

because she and Jason felt it would be a waste of time and money. (Id. ¶ 13.) They were primarily interested in the upstairs unit because they worried that burglars would have access to their windows in the downstairs unit. (Drenik Dep. at 77:10-23.) Also, the upstairs unit had a better view of William Land Park. (Id.) Nevertheless, Drenik left her phone number with Gordon, who allegedly agreed to contact her when the downstairs unit became available. (SDF ¶ 14.) Gordon never contacted her. (Id. ¶ 15.)

Around July 4, 2004, Drenik drove by the Ohanesian's property and saw that the "For Rent" sign was still posted. (Id. ¶ 16.) She then called the Ohanesians to see if the sign referred to a downstairs or an upstairs unit. (Id. ¶ 17.) Vera returned Drenik's call the next day and told her that the lower unit had been rented, but that there was an apartment available on the second floor. (Id. ¶ 18.) Vera then asked Drenik who would be living in the apartment, and Drenik responded that she, her husband, and her son would reside there. (Id. ¶¶ 19, 20.) Vera told Drenik that she did not like the idea of renting to a family with young children upstairs. (Id. ¶¶ 21, 22.)

A few days later, Drenik visited the Human Rights and Fair Housing Commission of Sacramento. (Id. ¶ 23.) The Commission used two testers to inquire by phone about renting at defendants' property. (Id. ¶ 25.) Both testers spoke with Gordon on July 15, 2004. (Id. ¶ 26.)

The first tester, Rosalind Robbins ("Robbins"), mentioned to

1  Gordon that she had an 18-month-old child.  (Id. ¶ 27.)
2  According to Robbins, Gordon "immediately began to show
3  reluctancy."  (Robbins Dep. at 42:14-20.)  His tone of voice
4  changed, and he started talking about his concerns with having a
5  young child in a second-level apartment because of the balcony.
6  (Id. at 42:18-43:4.)  He also said that he needed to check with
7  his insurance company before he could give her an application.
8  (Id. at 46:5-7, 53:20-21.)  Robbins responded by saying that she
9  was not concerned with this issue.  (Id. at 43:28-44:2.)  Gordon
10 told her, "[t]hings can happen quickly.  You might not think it's
11 a problem, but safety is a problem. . . .  [I]f you're not
12 concerned about the safety . . . I'm concerned about my
13 liabilities."  (SDF ¶¶ 31, 32.)  Robbins ended the conversation
14 by saying that she would drive by the apartment, and she would
15 contact him if she was interested in it.  (Robbins Dep. at 46:12-
16 13.)  Because Gordon did not tell her not to call, she felt that
17 he would have been receptive to "hearing back from her."  (Id. at
18 46:14-18.)

19    Both testers completed a "Debriefer Assessment Form."
20 (Defs.' SUF Ex. I.)  On the form, the testers indicated that
21 there was evidence of unequal treatment with regard to
22 availability because the landlord "offered[,] then refused to
23 rent to tester w/child."  (Id.)  The testers also indicated that
24 the landlord treated them differently because he was "reluctant
25 to continue relationship w/ tester who had kid.  Told tester w/
26 child he had to 'consult insurance' prior to renting."  (Id.)

4

1  However, in the "Overall Assessment" portion of the form, the
2  testers provided contradictory responses, in that they circled
3  "Yes" next to both "clearly no evidence of discrimination and/or
4  steering" and "substantial grounds for concluding that there was
5  discrimination or steering."  (Id.)

6  The Ohanesians rented the original upstairs unit, which
7  Drenik had viewed, to a family with a child in junior high
8  school.  (SDF ¶ 39.)  The record does not reflect whether the
9  testers inquired about a different unit, and, if so, who
10 ultimately rented that unit.

11                                II.

12     Title 42 U.S.C. section 3604(a) makes it unlawful to "refuse
13 to sell or rent after the making of a bona fide offer, or to
14 refuse to negotiate for the sale or rental of, or otherwise make
15 unavailable or deny, a dwelling to any person because of   . . .
16 familial status."  "Steering" is an example of "mak[ing]
17 unavailable" in violation of § [3604](a).  Fair Housing Congress
18 v. Weber, 993 F.Supp. 1286, 1293 (C.D. Cal. 1997); see also
19 Llanos v. Coehlo, 24 F.Supp.2d 1052, 1057 (E.D. Cal. 1998).
20 "Steering" is "not an outright refusal to rent to a person within
21 a class of people protected by the statute; rather it consists of
22 efforts to deprive a protected homeseeker of housing
23 opportunities in certain locations."  Id. (citing HUD v.
24 Edelstein, Fair Housing-Fair Lending ¶ 25,018, pp. 25,236, 25,239
25 (1991)).  At least in the context of this motion, defendants do
26 not dispute that a landlord may not "steer" families with young

5

children away from housing even if the housing could be dangerous to children.[1]  Proof of illegal steering does not require evidence of discriminatory intent.  <u>Weber</u>, 993 F. Supp. at 1293 (citing <u>Jancik v. HUD</u>, 44 F.3d 553, 556 (7th Cir. 1995)).  The test is whether the ordinary listener would understand that the owner is communicating a preference.  <u>Id.</u> (citing <u>United States v. Hunter</u>, 459 F.2d 205, 215 (4th Cir. 1972); <u>Ragin v. New York Times Co.</u>, 923 F.2d 995, 999-1000 (2d Cir. 1991)); <u>see also</u> <u>Llanos</u>, 24 F.Supp.2d at 1057 (citing <u>Ragin</u>, 923 F.2d at 999.).[2]

When viewing the facts in a light most favorable to plaintiff, a reasonable jury could conclude that the Ohanesians communicated to Drenik that they preferred not to rent second-floor balcony apartments to families with small children. Defendants do not dispute that Gordon told Drenik that: (1) he

---

[1] "A landlord cannot justify steering families with children away from housing by groundlessly claiming that the housing would be unsafe for resident children.  As a general rule, safety judgments are for informed parents to make, not landlords."  <u>Weber</u>, 993 F.Supp. at 1293.  At oral argument, all counsel agreed that steering may occur even if the landlord's safety fears are not groundless.  According to plaintiff's counsel, a landlord has immunity under state and federal law for any claim that arises out of an injury to a resident child where the property is otherwise in compliance with applicable codes.

[2] Using different words, FEHA employs much the same standard as the FHA.  It proscribes housing discrimination on the basis of familial status and prohibits "the owner of any housing accommodation" from making or causing to be made "any written or oral inquiry concerning the . . . familial status . . . of any person seeking to purchase, rent or lease any housing accommodation."  Cal. Gov't Code §§ 12955(a), (b).  Therefore, while the analysis below addresses plaintiff's claims under the FHA, it also applies to her claim under FEHA.

6

would have to consult with his wife if Drenik was interested in the upstairs apartment; and (2) a downstairs unit might be more suitable. (Response to Pl.'s SDF ¶¶ 7, 9.) Also, Drenik asserts that Vera told her that she did not like the idea of renting to a family with young children upstairs. (SDF ¶¶ 21, 22.)

A reasonable jury could conclude that these statements in context constituted "steering" of families with small children away from upper-level apartments. See Weber, 993 F.Supp. at 1293. Plaintiff's failure to file an application and submit the $12 credit check fee does not necessarily suggest otherwise. A jury could conclude that it shows that Drenik was indeed "steered" away from renting.

In response, defendants argue that plaintiffs do not allege "steering" with any specificity in their pleadings. (Reply at 5.) However, the complaint alleges that "[d]efendants made statements and continue to make statements with respect to the rental of the Subject Property that discriminates based on familial status . . . in violation of 42 U.S.C. §§ 3604(c) and (d)." (Compl. ¶¶ 27, 28.) While the word "steering" does not appear, this allegation is sufficient to state a steering claim. See Fed. R. Civ. P. 8.

Defendants also argue that the court should grant partial summary judgment as to the discrimination theories that Drenik concedes she is not advancing, including: (1) intentional discrimination; and (2) disparate impact. Because Drenik concedes that she is not pursuing these theories of liability,

7

the court grants partial summary judgment as to these issues.

### III.

For the reasons stated above, the court: (1) denies defendants' motion for summary judgment as to plaintiff's "steering" claim; and (2) grants partial summary judgment as to any claim of intentional discrimination or disparate impact.

IT IS SO ORDERED.

Dated: August 14, 2006

                                  /s/ David F. Levi
                                  DAVID F. LEVI
                                  United States District Judge